UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| MOTORIST COMMERCIAL MUTUAL INSURANCE COMPANY, ) ) ) | |
| Plaintiff, ) ) | |
| v. ) ) | No. 1:23-cv-00980-TWP-CSW |
| ELLISON DISTRIBUTING INC., ) DAILY FEED & GRAIN INC., ) ) | |
| Defendants. ) | |

### ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on a Motion for Summary Judgment filed pursuant to Federal Rule of Civil Procedure 56 by Plaintiff Motorist Commercial Mutual Insurance Company ("Motorist") (Filing No. 62). Motorist initiated this declaratory judgment action seeking an order from the Court that Motorist has no duty to defend or indemnify Defendant Ellison Distributing, Inc. ("Ellison"), under any policies of insurance that it issued to Ellison, against any settlement, judgment, verdict or award in an underlying lawsuit filed by Defendant Daily Feed & Grain, Inc. ("DFG") (Filing No. 1). Motorist seeks judgment as a matter of law that the insurance policies issued to Ellison do not cover the damages DFG seeks, and therefore Motorist has no duty to defend or indemnify Ellison. For the reasons explained below, summary judgment is **granted in part** and **denied in part**.

### I.   BACKGROUND

The following facts are not necessarily objectively true, but as required by Federal Rule of Civil Procedure 56, the facts are presented in the light most favorable to Ellison and DFG as the

non-moving parties. *See Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Motorist is an Ohio mutual insurance company incorporated under the laws of Ohio with its principal place of business in Columbus, Ohio (Filing No. 1 at 1). Defendant DFG is an Indiana corporation doing business in Bartholomew County, Indiana, and is in the business of farming, producing, and selling grain (Filing No. 1-3 at 1; Filing No. 62-1 at 11:21-12:20). Defendant Ellison is an Indiana corporation with its principal place of business in Dubois County, Indiana (Filing No. 1-3 at 1), and is in the business of selling and distributing grain storage handling and drying equipment (Filing No. 62-2 at 12:21-14:14).

On July 29, 2015, DFG and Ellison entered into a contract to construct and set up a non-GMO grain storage facility (the "Non-GMO Project") (Filing No. 1-1 at 1). The term "non-GMO" means "non-genetically modified" (Filing No. 62-1 at 13:22-23). One of the differences in storage requirements between GMO and non-GMO grain is that non-GMO grain requires very dry storage (Filing No. 62-6 at 39:11). GMO grain is sold at lower prices compared to non-GMO grain. (Filing No. 62-4 at 12). Under the contract, Ellison was to construct the Non-GMO Project to store, improve, dry, clean, and process the grain into a non-GMO food grade product (Filing No. 62-1 at 12:8–16).

DFG began using the grain bins Ellison constructed in the late fall of 2015. *Id.* at 43:1–2. However, water leaks were discovered in the bins after the first rain. *Id.* at 46:3–5. Ellison performed various work to fix the storage bins but was unsuccessful in its attempts, and mold occurred on the grain. *Id.* at 50:7–12. The 2015 grain harvest was rejected for non-GMO sales. *Id.* at 49:23. Some of the 2015 harvest was rotten, which required it to be thrown out, and the remainder was salvaged and sold as GMO grain. *Id.* at 50:4–8, 19–20.

Ellison resumed work on the Non-GMO Project in the spring of 2016 (Filing No. 62-2 at 28:25). By September of 2016, Ellison had left the Non-GMO Project. *Id.* at 70:10–12. DFG found that its 2016 harvest also had damage due to water leaks and excessive moisture. The 2016 harvest had to be blended and sold as GMO grain (Filing No. 62-1 at 140:1–6). DFG subsequently had the grain bins torn down and rebuilt. *Id.* at 139:21–24.

Motorist issued a commercial business insurance policy (Policy #6-2362048) (the "Primary Policy") to Ellison (Filing No. 1-5 at 7). The Primary Policy was effective from March 5, 2016, to March 5, 2017. *Id.* at 2. The Primary Policy contains, in relevant part, the following agreement:

> **1. Insuring Agreement**
>
> a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. . . .
>
> b. This insurance applies to "bodily injury" or "property damage" only if:
>
> > **(1)** The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory."

(Filing No. 1-5 at 45). The Primary Policy defines an "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions," and defines "property damage" as "[p]hysical injury to tangible property, including all resulting loss of use of that property," or "[l]oss of use of tangible property that is not physically injured." *Id.* at 58–59. The Primary Policy also contains, in relevant part, the following exclusions:

> **j. Damage To Property**
>
> "Property Damage" to: . . . .
>
> > **(6)** That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it. . . .

3

>> Paragraph **(6)** of this exclusion does not apply to "property damage" included in the "products-completed operations hazard." . . . .
>
> **m. Damage To Impaired Property Or Property Not Physically Injured**
>
> "Property damage" to "impaired property" or property that has not been physically injured, arising out of:
>
> **(1)** A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or
>
> **(2)** A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.
>
> This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

*Id.* at 48–49. The Primary Policy further contains the following definitions:

> **8.** "Impaired Property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:
>
> **a.** it incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or
>
> **b.** You have failed to fulfill the terms of a contract or agreement;
>
> if such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work" or your fulfilling the terms of the contract or agreement. . . .
>
> **16.** "Products-completed operations hazard":
>
> **a.** Includes all "bodily injury" and "property damage" occurring away from the premises you own or rent and arising out of "your product" or "your work" except:
>
> **(1)** Products that are still in your physical possession; or
>
> **(2)** Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:
>
> **(a)** When all of the work called for in your contract has been completed.

4

  **(b)** When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

  **(c)** When that part of the work done at the job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

 Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed. . . .

**21.** "Your product":

 **a.** Means:

  **(1)** Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

   **(a)** You;

   **(b)** Others trading under your name; or

   **(c)** A person or organization whose business or assets you have acquired; and

  **(2)** Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products. . . .

**22.** "Your work":

 **a.** Means:

  **(1)** Work or operations performed by you or on your behalf; and

  **(2)** Materials, parts or equipment furnished in connection with such work or operations.

*Id.* at 57–60.

  Motorist also issued a commercial liability umbrella policy (Policy # 6-2362049) effective March 5, 2016, to March 5, 2017 (the "Umbrella Policy") (the Primary Policy and Umbrella Policy, together, the "Policies"), to Ellison (Filing No. 1-6 at 6). The only distinction between the Primary Policy and the Umbrella Policy is the absence of an identical Section I(2)(j)(6), the "Damage to

5

Property" exclusion (Filing No. 1-6). Neither party disputes that the alleged events occurred during the time the Primary Policy and Umbrella Policy were effective, nor do the parties dispute that the alleged events occurred within the "covered territory."

On August 24, 2017, DFG filed an Amended Complaint against Ellison (the "Underlying Lawsuit") alleging theories of liability, faulty workmanship, breach of contract, and negligence by Ellison when constructing the Non-GMO Project (Filing No. 1 at 3-4). Ellison tendered the Amended Complaint to Motorist for defense and indemnity under certain policies of insurance issued by Motorist to Ellison. *Id.* at 4. Motorist advised Ellison that it would defend Ellison subject to a reservation of rights in the Underlying Lawsuit. *Id.*

On June 6, 2023, Motorist initiated this action alleging "[t]here is no coverage for the claims, causes of action, and damages claimed in the [Underlying Lawsuit] under the Primary Policy" and "[t]here is no coverage for the claims, causes of action, and damages claimed in the [Underlying Lawsuit] under the Umbrella Policy." (Filing No. 1 at 10–11). Motorist seeks a declaratory judgment it has no duty to defend or indemnify under either of the Policies of insurance issued to Ellison in the Underlying Lawsuit brought by DFG. *Id* at 11.

DFG is seeking damages in the Underlying Lawsuit in the forms of (A) economic losses DFG incurred due to the damaged grain and lost profits based on DFG's inability to use the Non-GMO Project to store and process Non-GMO grain during repair and replacement of Ellison's work, (B) amounts paid to Ellison to construct the Non-GMO Project, and (C) the amounts paid to complete or replace Ellison's work (Filing No. 1-3). Motorist now seeks on summary judgment a declaration that there is no coverage for any of the damages DFG seeks or, in the alternative, an entry of summary judgment declaring which categories of damages are not covered, and which categories of damages are covered (Filing No. 70 at 3).

## II.     SUMMARY JUDGMENT STANDARD

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007). In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante*, 555 F.3d at 584 (citation omitted). "However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation and quotation marks omitted). Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "The opposing party cannot meet this burden with conclusory statements or speculation but only with appropriate citations to relevant admissible evidence." *Sink v. Knox County Hosp.*, 900 F. Supp. 1065, 1072 (S.D. Ind. 1995) (citations omitted).

"In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of [the] claim." *Ritchie v. Glidden Co*., 242 F.3d 713, 723 (7th Cir. 2001) (citations and quotation marks omitted). "[N]either the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion

7

for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and quotation marks omitted).

### III. DISCUSSION

Motorist asks the Court to enter summary judgment declaring that there is no coverage under either the Primary Policy or the Umbrella Policy for the damages DFG seeks in the Underlying Lawsuit. In the alternative, Motorist asks the Court to declare which categories of damages are covered in the event the Court finds that there is coverage for some of the damages. The categories of damages DFG seek can be categorized as such: (A) economic losses DFG incurred due to the damaged grain and lost profits based on DFG's inability to use the Non-GMO Project to store and process non-GMO grain during the repair and replacement of Ellison's work, (B) amounts paid to Ellison to construct the Non-GMO Project, and (C) the amounts paid to complete or replace Ellison's work.

Neither party raises the issue of choice of law. Thus, the substantive law of Indiana, the forum state, guides the Court's analysis in this diversity suit. *Wood v. Mid-Valley Inc.*, 942 F.2d 425, 426–27 (7th Cir. 1991). In Indiana, the terms of insurance policies should be construed using the same rules that apply to contracts. *Erie Indem. Co. for Subscribers at Erie Ins. Exch. v. Estate of Harris by Harris*, 99 N.E.3d 625, 630 (Ind. 2018). While some "'special rules of construction of insurance contracts have been developed due to the disparity in bargaining power between insurers and insureds, if a contract is clear and unambiguous, the language therein must be given its plain meaning.'" *Beam v. Wausau Ins. Co.*, 765 N.E.2d 524, 528 (Ind. 2002) (quoting *Allstate Ins. Co. v. Boles*, 481 N.E.2d 1096, 1101 (Ind. 1985)). However, "'[w]here there is ambiguity, insurance policies are to be construed strictly against the insurer' and the policy language is viewed from the

8

standpoint of the insured." *Id.* (alteration in original) (quoting *Bosecker v. Westfield Ins. Co.*, 724 N.E.2d 241, 244 (Ind. 2000)).

An insured has the burden of proof to show its claim is covered under the terms of the policy, and the insurer has the burden of proof to show that an otherwise covered claim is barred by an exclusion in the policy. *Berry Plastics Corp. v. Ill. Nat'l Ins. Co.*, 903 F.3d 630, 635 (7th Cir. 2018). Pursuant to the terms of the policy, Motorist agreed to pay damages that occurred because of "property damage" if such "property damage" happened due to an "occurrence."

### A.     Lost Profits

"[L]ost profits are a form of business loss and . . . are not the type of injury that the ordinary commercial general liability policy insures against." *Id.* When an insurer like Motorist provides commercial general liability policies, they are undertaking to insure against property damage or bodily injury "that results from the manufacturer's product after it leaves the manufacturer's hands, which represents a distinctly different form of risk from the disappointed commercial expectations of the manufacturer's customer." *Id.* at 635–36 (citing *T.R. Bulger, Inc. v. Ind. Ins. Co.*, 901 N.E.2d 1110, 1115 (Ind. Ct. App. 2009)). When a manufacturer has designed a product to meet the specific needs of one customer, the manufacturer's insurer stands at a remove from that relationship. *Id.* at 636. Further, the Primary Policy expressly excludes "[p]roperty damage" to "your product" arising out of it or any part of it (Filing No. 1-5 at 49). "'Your product'" means "[a]ny goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by: (a) You; (b) Others trading under your name; or (c) A person or organization whose business or assets you have acquired." *Id.* at 59. Such exclusion is a classic business risk exclusion that would exclude losses for which Ellison is deemed liable because its products have not functioned the way DFG expected. *Berry Plastics*, 903 F.3d at 636.

9

The Indiana Supreme Court's decision in *Sheehan Construction Co. v. Continental Casualty Co.*, 935 N.E.2d 160 (Ind. 2010), *adhered to in relevant part as modified on reh'g*, 938 N.E.2d 685 (Ind. 2010), provides further guidance on this analysis. *Berry Plastics*, 903 F.3d at 637. The court in *Sheehan* found that coverage under a commercial general liability policy should be determined pursuant to the terms of the policy rather than by legal theories. 935 N.E.2d at 167–72.

Motorist contends that DFG has failed to identify a particular "occurrence" as defined by the Policies, and thus no coverage exists (Filing No. 70 at 5). However, the Primary Policy defines an "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (Filing No. 1-5 at 58). The grain was alleged to have been continuously exposed to harmful conditions—the allegedly defective storage bins constructed by Ellison—causing the grain to become too wet to be used for non-GMO product. Moreover, the Indiana Supreme Court in *Sheehan* specifically held that "faulty workmanship does constitute an ['occurrence'] so long as the resulting damage is an event that occurs without expectation or foresight." 935 N.E.2d 160, 169 (Ind. 2010). No expectation or foresight of faulty workmanship exists in this case. Thus, the Court concludes that an "occurrence," as defined by the Policies, existed.

The Court must determine whether DFG's economic losses and lost profits constitute "property damage" within the meaning of the Policies. Motorist argues that DFG's economic losses and lost profits can be split into three categories: (1) the products of the 2015 grain harvest that were destroyed, (2) the products of the 2015 and 2016 grain harvests that were re-blended and sold as GMO product, and (3) DFG's alleged lost profits for its inability to use the Non-GMO Project. The Court will address each in turn.

1. **Destroyed Products of the 2015 Grain Harvest**

First, Motorist concedes that should the Court hold there was an "occurrence," as defined by the Policies, then there may be coverage for the products of the 2015 grain harvest that were damaged and destroyed (Filing No. 70 at 5). The Court has concluded above that an "occurrence," as defined by the Policies, existed, and thus, Motorist's Motion for Summary Judgment is **denied** as to damages DFG incurred for the products of the 2015 grain harvest that were destroyed.

2. **Re-Blended and Resold Products from the 2015 and 2016 Grain Harvests**

Second, Motorist argues that DFG's economic losses on the products from the 2015 and 2016 grain harvests that were re-blended and resold are barred by both the Subsection (6) of exclusion (j), the Damage to Property exclusion, and exclusion (m), the Damage to Impaired Property exclusion, contained in the Primary Policy. *Id.* at 5–7.

   a. **The Damage to Property Exclusion**

The Damage to Property exclusion bars coverage for "property damage" for "[t]hat particular part of any property that must be restored, repaired or replaced because 'your work' was incorrectly performed on it." (Filing No. 1-5 at 50-51). The Primary Policy defines "Your work" as "[w]ork or operations performed by [Ellison] or on [its] behalf," including "[m]aterials, parts or equipment furnished in connection with such work or operations." *Id.* at 60. However, the exclusion does not apply to work that falls within the "Products-completed operations hazard" definition which includes work that is abandoned, incomplete, or still in Ellison's possession. *Id.* at 59. Further, work will be deemed complete by the terms of the agreement when "that part of the work done at the job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project." *Id.*

In support of its argument, Motorist cites *Homebuilding LLC v. Maryland Casualty Co.*, 470 F.3d 1003, 1012 (10th Cir. 2006). In that case, the Tenth Circuit held that a similar exclusion barred coverage for the cost of repairing or replacing windows because they were damaged during installation. *Id.* The case before the Court is distinguishable because the damages here are not for "that particular part" of work that was defectively performed. *Fortney & Weygandt, Inc. v. Am. Mfrs. Mut. Ins. Co.*, 595 F.3d 308, 311 (6th Cir. 2010). Rather, the damages are for other property—the damaged grain—that was damaged as a result from the allegedly defective work on the Non-GMO Project.

Motorist also cites *West Side Salvage, Inc., v. RSUI Indem. Co.*, 878 F.3d 219 (7th Cir. 2017) (applying Illinois law). The court in *West Side Salvage* held that a similar "damage to property" exclusion applied when a party brought a property damage claim caused by ongoing operations rather than completed work. 878 F.3d at 223. However, there are no ongoing operations in the case before the Court. Moreover, by the terms of the Primary Policy, the Damage to Property exclusion applies only to abandoned work, incomplete work, and work still in Ellison's physical possession. The Primary Policy specifically states that work will be deemed complete when the work "has been put to its intended use." ([Filing No. 1-5 at 59](Filing No. 1-5 at 59)). DFG clearly put the work to its intended use. DFG used the grain bins to store and process grain. Thus, the Primary Policy deems the work completed, and the Damage to Property exclusion does not apply to the economic losses of the damaged 2015 and 2016 grain harvests.

 b. **The Damage to Impaired Property Exclusion**

The Damage to Impaired Property exclusion excludes coverage for "'property damage' to 'impaired property' or property that has not been physically injured, arising out of: (1) A defect,

12

deficiency, inadequacy, or dangerous condition in 'your product' or 'your work.'" (Filing No. 1-5 at 49). The policy defines "impaired property" as

> tangible property, other than 'your product' or 'your work', that cannot be used or is less useful because: . . . it incorporates 'your product' or 'your work' that is known or thought to be defective . . . if such property can be restored to use by the repair, replacement, adjustment or removal of 'your product' or 'your work' . . . .

*Id.* at 57.

Motorist contends that the products from the 2015 and 2016 grain harvests that DFG salvaged and sold constitute "impaired property" because selling the grain was useful to DFG and, therefore, the grain was "restored to use." (Filing No. 63 at 27).

Both parties point the Court to *Sokol & Co. v. Atlantic Mutual Insurance Co.*, 430 F.3d 417 (7th Cir. 2005), in support of their respective contentions. In *Sokol,* an Illinois food products manufacturer supplied sealed packets of peanut butter to a cookie-mix company for inclusion in its cookie-mix boxes. When it was discovered that the peanut butter packets were rancid, the cookie mix company commenced a lawsuit against the food products manufacturer. The food products manufacturer in turn sued its insurance company pursuant to a commercial general liability policy containing an identical "damage to impaired property" provision as in Motorist's Policy in this case. The Seventh Circuit held that a seller's cookie-mix boxes containing the insured's rancid peanut butter packets were "impaired property" because they could be restored to use by removing and replacing the peanut butter packets. 430 F.3d at 423. The facts of this case differ from *Sokol* and, as such, warrant a different outcome. The cookie-mix boxes in *Sokol* could easily be "restored to use" by removing and replacing the rancid peanut butter packets. *Id.* Here, there is no suggestion from either party that the grain could be restored. Rather, the evidence supports, and neither party disputes, the conclusion that the grain was too wet to be used for non-GMO product and had to be used for less expensive GMO product.

13

The Court is not persuaded by Motorist's contention that the use of the grain in its damaged condition amounts to the grain being "restored to use." For the Damage to Impaired Property exclusion to apply, there must be evidence that the damage can be restored by the repair, replacement, adjustment or removal of Ellison's work. *Federated Mut. Ins. Co. v. Grapevine Excavation, Inc.*, 197 F.3d 720, 729 (5th Cir. 1997). It is not enough to assert that the damaged grain could be used in its damaged condition for a lesser purpose. Thus, the Damage to Impaired Property exclusion does not apply to the economic losses from the damaged 2015 and 2016 grain harvests.

As neither the Damage to Property exclusion nor the Damage to Impaired Property exclusion applies, Motorist's Motion for Summary Judgment is **denied** as to damages DFG incurred for the products of the 2015 and 2016 grain harvests that were re-blended and sold as GMO grain.

### 3. Lost Profits Due to Inability to Use the Non-GMO Project

This brings the Court to the question of whether the Policies provide coverage for the loss of profits DFG seeks from Ellison due to DFG's inability to use the Non-GMO Project during the repair and replacement of Ellison's work. Commercial general liability policies insure against property damage or bodily injury "that results from the manufacturer's product after it leaves the manufacturer's hands, which represents a distinctly different form of risk from the disappointed commercial expectations of the manufacturer's customer." *Berry Plastics*, 903 F.3d at 635–36. Yet, the Seventh Circuit's decision in *Wausau Underwriters Insurance Co. v. United Plastics Group, Inc.*, 512 F.3d 953 (7th Cir. 2008), leaves the door open for such policies to cover lost future profits if such damages were specifically due to property damage rather than a defective product not functioning as expected or warranted. *Berry Plastics*, 903 F.3d at 642.

Turning to the case before the Court, while the allegedly faulty work on the storage bins caused "property damage" to the 2015 and 2016 grain harvests, there is no evidence that the storage bins continued to cause property damage beyond that point. Rather, the evidence shows that Ellison's allegedly faulty work was removed and repaired as soon as the 2016 harvest was removed (Filing No. 62-6 at 139:21–24). Thus, any damages DFG incurred after the allegedly faulty bins were removed are consequential damages attributable to a defective product failing to function as expected. Such damages could not have occurred as a result of the property damage to the 2015 and 2016 grain harvests. Motorist's Motion for Summary Judgment is therefore **granted** as to damages DFG incurred due to its inability to use the Non-GMO Project during the repair and replacement of Ellison's work.

B.  **Cost of Repair and Replacement**

DFG also seeks damages in the amounts it paid to complete or replace Ellison's work. However, such damages constitute a business risk rather than a risk of occurrences that give rise to insurable liability. *Jim Barna Log Sys. Midwest, Inc. v. Gen. Cas. Ins. Co. of Wis.*, 791 N.E.2d 816, 823 (Ind. Ct. App. 2003).

> [A] contractor holds himself out as being capable of completing the bargained-for construction in a workmanlike manner. At the same time, the property owner relies upon that representation and anticipates suitable goods and services. When the contractor's work is faulty, either express or implied warranties are breached, and a dissatisfied customer may recover the cost of repair or replacement of the faulty work from the contractor as the standard measure of damages for breach of warranty.

*Id.* at 823–24 (alteration in original) (quoting *R.N. Thompson & Assoc., Inc. v. Monroe Guar. Ins. Co.*, 686 N.E.2d 160, 162 –63 (Ind. Ct. App. 1997), *transfer denied*). "This business risk is born[e] by the contractor and is not insured by a CGL policy." *T.R. Bulger*, 901 N.E.2d at 1115. "To hold otherwise would effectively convert the policy into a performance bond or guarantee of contractual

15

performance and result in coverage for the repair and replacement of the insured's own faulty workmanship." *Ind. Ins. Co. v. DeZutti*, 408 N.E.2d 1275, 1279 (Ind. 1980).

In the case before the Court, DFG and Ellison contracted for Ellison to construct the Non-GMO Project. When DFG became unsatisfied with Ellison's work, DFG had Ellison's work replaced. This is a contractual issue between DFG and Ellison and not one that gives rise to liability under Motorist's policies. Motorist's Motion for Summary Judgment is therefore **granted** as to damages DFG incurred in the amounts DFG paid to repair and replace Ellison's work.

### C. Amounts Paid to Ellison

DFG seeks damages in the amounts it paid to Ellison to complete the Non-GMO Project. The risk intended to be insured by the Primary Policy is "the possibility that the goods, products[,] or work of the insured, once relinquished or completed, will cause bodily injury or damage to property other than to the product or completed work itself, and for which the insured may be found liable." *DeZutti*, 408 N.E.2d at 1279 (quoting Roger C. Henderson, *Insurance Protection for Products Liability and Completed Operations—What Every Lawyer Should Know*, 50 Neb. L. Rev. 415, 441 (1971)). For the same reasons stated above, this is a contractual issue between DFG and Ellison and thus, is not covered by the Primary Policy. Therefore, Motorist's Motion for Summary Judgment is **granted** as to damages DFG incurred in the amounts DFG paid to Ellison to construct the Non-GMO Project.

### D. The Umbrella Policy

The parties agree that where the language is identical between the Primary Policy and the Umbrella Policy, the Court's determination will also be identical (Filing No. 70 at 7). The only distinction between the policies is that the Umbrella Policy does not contain the same Damage to Property exclusion. DFG contends that even if the Damage to Property exclusion applies in the

16

Primary Policy, the absence of an identical exclusion in the Umbrella Policy causes the Umbrella Policy to drop down and provide coverage for the Underlying Lawsuit. However, this distinction is immaterial, as the Court concluded above that the Damage to Property exclusion does not apply in the Primary Policy. Because the Policies are otherwise identical, for the reasons explained above, coverage under the Umbrella Policy is the same as under the Primary Policy.

## IV.   CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment ([Filing No. 62](#)) is **GRANTED in part and DENIED in part.** Summary Judgment is **granted** as to Motorist's duty to defend and indemnify Ellison against damages in the Underlying Lawsuit in the form of amounts DFG paid to Ellison to construct the Non-GMO Project, amounts DFG paid to repair and replace Ellison's work, and DFG's lost profits due to its inability to use the Non-GMO Project during the repair and replacement of Ellison's work.

Plaintiff's Motion for Summary Judgment is **denied** as to Motorist's duty to defend and indemnify Ellison against damages in the Underlying Lawsuit in the form of amounts that DFG incurred for the products of the 2015 grain harvest that were destroyed and amounts DFG incurred for the products of the 2015 and 2016 grain harvests that were re-blended and sold as lesser GMO products.

**SO ORDERED.**

Date: 2/27/2025

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

Distribution:

Edmund Leonard Abel
LEWIS WAGNER, LLP
eabel@lewiswagner.com

Brad A. Catlin
Williams Law Group, LLC
brad@williamsgroup.law

Meghan Eileen Ruesch
LEWIS WAGNER, LLP
mruesch@lewiswagner.com

James P. Strenski
Drewry Simmons Vornehm, LLP
jstrenski@dsvlaw.com

John A. Stroh
SHARPNACK BIGLEY STROH & WASHBURN LLP
sbsw@sbswlaw.com