UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| MOTORIST COMMERCIAL MUTUAL INSURANCE COMPANY, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Case No. 1:23-cv-00980-TWP-CSW ) |
| ELLISON DISTRIBUTING INC., DAILY FEED & GRAIN INC., | ) ) ) ) |
| Defendants. | ) |

**ORDER DENYING DEFENDANT'S MOTION
TO AMEND OR ALTER JUDGMENT**

This matter is before the Court on a Motion to Amend or Alter Judgment (Filing No. 92) filed by Defendant Daily Feed & Grain Inc. ("DFG"). Plaintiff Motorist Commercial Mutual Insurance Company ("Motorist") initiated this declaratory judgment action seeking an order that it did not have a duty to defend or indemnify Defendant Ellison Distributing Inc. ("Ellison") in an underlying lawsuit filed by DFG (Filing No. 1). The undersigned issued an Order Granting in Part and Denying in Part Motorist's summary judgment motion (the "Order"), and concluded that Motorist had no duty to defend Ellison for the repair and replacement of Ellison's allegedly faulty work (Filing No. 76). DFG asks the Court to reconsider its Order solely on this issue contending that the Order conflicts with Indiana law (Filing No. 93 at 1). For the reasons discussed below, the motion to reconsider is **denied**.

**I.    BACKGROUND**

This background section is not meant to be a complete recitation of all material facts of the case as that can be found in the Order (Filing No. 76). Rather, the Court merely recites those facts pertinent to the instant motion.

On July 29, 2015, DFG and Ellison entered into a contract to construct and set up a non-GMO grain storage facility (the "Non-GMO Project") (Filing No. 1-1 at 1). Under the contract, Ellison was to construct the Non-GMO Project to store, improve, dry, clean, and process grain so that DFG could then sell the grain as a non-GMO food grade product (Filing No. 62-1 at 12:8–16).

After Ellison constructed grain bins for storage of DFG's grain as part of the Non-GMO Project, DFG began using the bins in late fall of 2015. *Id*. at 43:1–2. However, mold occurred in the grain causing DFG to salvage what grain of the harvest it could and dispose of the rest. *Id*. at 50:4–8, 19–20. Ellison then resumed work on the Non-GMO Project in the spring of 2016 in an attempt to rectify the issues but was removed from the Non-GMO Project by September 2016 (Filing No. 62-2 at 28:25, 70:10–12). DFG found that its 2016 harvest was also damaged and subsequently had the grain bins torn down and rebuilt (Filing No. 62-1 at 139:21–140:6).

Motorist issued a commercial business insurance policy (the "Primary Policy") to Ellison (Filing No. 1-5 at 7). The Primary Policy was effective during all relevant times. The Primary Policy contains, in relevant part, the following agreement:

**1. Insuring Agreement**

    a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. . . .

    b. This insurance applies to "bodily injury" or "property damage" only if:

        (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

*Id*. at 45. The Primary Policy defines an "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions," and defines "property

damage" as "[p]hysical injury to tangible property, including all resulting loss of use of that property," or "[l]oss of use of tangible property that is not physically injured." *Id*. at 58–59. The Primary Policy also contains, in relevant part, the following exclusions:

> **j. Damage To Property**
>
>> "Property Damage" to: . . . .
>>
>> (6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it. . . .
>>
>> Paragraph (6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard." . . . .
>
> **m. Damage To Impaired Property Or Property Not Physically Injured**
>
>> "Property damage" to "impaired property" or property that has not been physically injured, arising out of:
>>
>> **(1)** A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or
>>
>> **(2)** A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.
>>
>> This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

*Id*. at 48–49. The Primary Policy further contains the following definitions:

> **8.** "Impaired Property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:
>
>> **a.** it incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or
>>
>> **b.** You have failed to fulfill the terms of a contract or agreement;
>>
>> if such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work" or your fulfilling the terms of the contract or agreement. . . .
>
> **16.** "Products-completed operations hazard":

3

**a.** Includes all "bodily injury" and "property damage" occurring away from the premises you own or rent and arising out of "your product" or "your work" except:

(1) Products that are still in your physical possession; or

(2) Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

**(a)** When all of the work called for in your contract has been completed.

**(b)** When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

**(c)** When that part of the work done at the job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed. . . .

**21.** "Your product":

**a.** Means:

**(1)** Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

**(a)** You;

**(b)** Others trading under your name; or

**(c)** A person or organization whose business or assets you have acquired; and

(3) Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products. . . .

**22.** "Your work":

**a.** Means:

**(1)** Work or operations performed by you or on your behalf; and

> **(2)** Materials, parts or equipment furnished in connection with such work or operations.

*Id*. at 57–60.

On August 24, 2017, DFG filed a state court action (the "Underlying Lawsuit") against Ellison and Motorist as his insurer alleging various theories of liability against Ellison for the construction of the Non-GMO Project (Filing No. 1 at 3–4). Ellison tendered the Underlying Lawsuit to Motorist who advised that it would defend Ellison subject to a reservation of rights. *Id*. DFG is seeking damages in the Underlying Lawsuit in the forms of (A) economic losses and lost profits, (B) amounts paid to Ellison to construct the Non-GMO Project, and (c) amounts paid to complete or replace Ellison's work (Filing No. 1-3).

Motorist initiated this action on June 6, 2023, seeking a declaratory judgment that it has no duty to defend Ellison in the Underlying Lawsuit (Filing No. 1 at 10–11). On September 23, 2024, Motorist moved for summary judgment seeking a declaration that there is no coverage for any of the damages DFG seeks or, in the alternative, an entry of summary judgment declaring which categories of damages were covered by the Primary Policy and which were not (Filing No. 70).

On February 27, 2025, the Court issued an Order Granting in Part and Denying in Part the summary judgment motion, finding that the Primary Policy did not provide coverage for the cost of repair and replacement due to the allegedly faulty workmanship Ellison performed. (Filing No. 76 at 15–16). DFG now asks the Court to reconsider only that determination of its Order.

## II.     LEGAL STANDARD

Though DFG titles its Motion as a Motion to Amend or Alter Judgment, the Motion is filed pursuant to Federal Rule of Civil Procedure 54(b). Accordingly, the Court considers the Motion as a Motion to Reconsider under Rule 54(b).

Motions to reconsider "serve a limited function: to correct manifest errors of law or fact or to present newly discovered evidence." *State Farm Fire & Cas. Co. v. Nokes*, 263 F.R.D. 518, 526 (N.D. Ind. 2009). The motion is to be used "where the Court has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension." *Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1191 (7th Cir. 1990) (citation omitted). A motion to reconsider under Rule 54(b) may also be appropriate where there has been "a controlling or significant change in the law or facts since the submission of the issue to the Court." *Id*. (citation omitted).

The purpose of a motion for reconsideration is to ask the Court to reconsider matters "properly encompassed in a decision on the merits." *Osterneck v. Ernst & Whinney*, 489 U.S. 169, 174 (1989). The motion "will be successful only where the movant clearly establishes: (1) that the court committed a manifest error of law or fact, or (2) that newly discovered evidence precluded entry of judgment." *Cincinnati Life Ins. Co. v. Beyrer*, 722 F.3d 939, 954 (7th Cir. 2013) (citation and quotation marks omitted). Furthermore,

> Motion practice is not an exercise in trial and error or maybe-maybe not where a party can reserve arguments to present later if earlier ones fail. The Court is entitled to assume that, if [a party] had viable arguments to support its claim, it would have presented them. The Court will not conduct [a party's] research and build [the party's] analysis in order to find facts and law to support [the party's] own claims.

*Brownstone Publ'g, LLC v. AT&T, Inc.*, No. 07-cv-1630, 2009 U.S. Dist. LEXIS 25485, at *2 (S.D. Ind. Mar. 24, 2009). A motion to reconsider "is not an opportunity to relitigate motions or present arguments, issues, or facts that could and should have been presented earlier." *Id*.

### III.   DISCUSSION

DFG requests that the Court reconsider the portion of the Order where the Court found that Motorist's policies do not provide coverage for the repair or replacement of the allegedly defective

6

work Ellison performed on the Non-GMO Project (Filing No. 93 at 1). Specifically, DFG argues that the Court committed a manifest error of law because the Order conflicts with the Indiana Supreme Court's decision in *Sheehan Constr. Co. v. Cont'l Cas. Co.*, 935 N.E.2d 160 (Ind. 2010) (Filing No. 93 at 3). DFG contends that the Indiana Supreme Court in *Sheehan* held that unintentional defective work constitutes an accident or "occurrence" under a Commercial General Liability ("CGL") policy such as the Primary Policy.

DFG also argues that the Court's reliance on *Indiana Insurance Co. v. DeZutti*, 408 N.E.2d 1275 (Ind. 1980) is misguided because the Indiana Supreme Court in *Sheehan* clarified that its holding in *DeZutti* was not based on the insuring provision or the definition of "property damage" or "occurrence," but rather because faulty workmanship was specifically excluded based on the business risk exclusionary clauses in the contract (Filing No. 93 at 5 (citing *Sheehan*, 935 N.E.2d at 166)). DFG asserts that the business risk rule is therefore not an initial bar to coverage as the Court found in its Order.

First, the Court previously considered *Sheehan* in its Order evidenced by the Court quoting the same portion of the opinion DFG now urges the Court to reconsider (*see* Filing No. 76 at 10 (quoting *Sheehan*, 935 N.E.2d at 169) ("faulty workmanship does constitute an ['occurrence'] so long as the resulting damage is an event that occurs without expectation or foresight.")). Indeed, the Court specifically attributed this holding in *Sheehan* when the Court found that an "occurrence," as defined by the Primary Policy, was present in this case. *Id*. Accordingly, DFG fails to present any new arguments not considered by the Court in the Order.

Second, DFG misunderstands the Court's decision. After finding that an occurrence existed, the Court then explained that the decision of whether certain damages were covered by the Primary Policy turned on whether such damages constituted "property damage" within the meaning of the

7

Primary Policy and whether any exclusions applied. *Id*. While DFG is correct that the Court cited *DeZutti* for the proposition that the business risk of faulty workmanship is generally not covered under a standard CGL policy, the Court did not premise its holding on whether an "occurrence" existed—the Court found that it did. Rather, the Court stated, "[i]n the case before the Court, DFG and Ellison contracted for Ellison to construct the Non-GMO Project. When DFG became unsatisfied with Ellison's work, DFG had Ellison's work replaced. This is a contractual issue between DFG and Ellison and not one that gives rise to liability under Motorist's policies." (Filing No. 76 at 16).

Accordingly, the holding in *Sheehan* does not change the Court's decision because the Court already found that an occurrence existed pursuant to *Sheehan*. Instead, as the Indiana Supreme Court did in *Dezutti*, the Court found that the CGL policy in this case did not give rise to liability for the repair of Ellison's allegedly faulty work under Motorist's policies despite the existence of an "occurrence." While not specifically enumerated in the section discussing the repair and replacement of the grain bins, this conclusion was reached in part based on the determination that there was no "property damage" to the grain bins—a requirement for coverage discussed previously in the Order. The Court's determination was also based on the various exclusions discussed at length in the Order.

While the Court agrees with DFG that faulty workmanship constitutes an "occurrence" in this case, the CGL policy provides coverage for the resulting "property damage" such as the ruined grain, not the repair of the grain bins themselves. This is in line with the Court's determination in its Order that the Primary Policy provides coverage for some of the damaged grain. However, the Primary Policy does not provide coverage for repairs allegedly necessary to prevent property damage. *See Cont'l Cas. Co. v. Sycamore Springs Homeowners Ass'n*, 2010 U.S. Dist. LEXIS

8

90378, at *17 (S.D. Ind. 2010) ("The plain language of the policy provides coverage of damages for the happening of an accident or occurrence, not damages that are necessary to prevent an occurrence"), aff'd by *Cont'l Cas. Co. v. Sycamore Springs Homeowners Ass'n*, 652 F.3d 804 (7th Cir. 2011).

The Court's determination is further bolstered by the example used in *Sheehan*. The Indiana Supreme Court in *Sheehan* used the following example to illustrate its point:

> [I]f a contractor improperly installs a shingle that later falls and hits a passerby, this event is unforeseeable and is an "occurrence" or "accident." . . . A shingle falling and injuring a person is a natural consequence of an improperly installed shingle just as water damage is a natural consequence of an improperly installed window. If we assume that either the shingle or the window installation will be completed negligently, it is foreseeable that damages will result. If, however, we assume that the installation of both the shingle and the window will be completed properly, then neither the falling shingle nor the water penetration is foreseeable and both events are "accidents."

935 N.E.2d at 170 (quoting *Travelers Indem. Co. of Am. v. Moore & Assocs.*, 216 S.W.3d 302, 309 (Tenn. 2007) (alteration in original)). This example discusses only damages resulting from faulty workmanship rather than the repair or replacement to prevent damages due to the faulty workmanship. Applying the example to the case before it, the Indiana Supreme Court stated, "if the faulty workmanship was the product of unintentional conduct then we start with the assumption . . . that the work . . . would be completed properly. The resulting damage would therefore be unforeseeable and constitute an 'accident' and therefore an 'occurrence' within the meaning of the Insurers CGL policies." *Id*. Applying that reasoning to the case before the Court, the Court properly concluded that any damage to the grain constituted an "occurrence." (Filing No. 76 at the court 10). The same reasoning does not, however, require a finding of coverage for the repair or prevention of an occurrence due to allegedly faulty work.

Further, DFG overextends the holding in *Sheehan*. DFG argues that by overturning the trial court's determination that there was no occurrence or property damage, the Indiana Supreme Court

9

held that faulty workmanship is itself "property damage." (Filing No. 97 at 3). That is not what *Sheehan* states. In *Sheehan*, the trial court held that there was no damage to property other than the structural components of houses built by Sheehan and thus, there was no "occurrence" or "property damage." The Indiana Supreme Court stated that the trial court was in error because "[a]s we have explained faulty workmanship may constitute an accident and thus an occurrence depending on the facts." *Sheehan*, 935 N.E.2d at 171–172. The trial court's decision was then reversed and remanded for further proceedings to determine whether the faulty workmanship was the product of intentional versus unintentional conduct. *Id*. at 172. However, *Sheehan* did not hold that faulty workmanship itself is automatically "property damage" as DFG contends. Indeed, the main thrust of the opinion focused on the term "occurrence" rather than any in depth discussion about what specifically constitutes "property damage." *See id*.

The Court finds further support that faulty workmanship is not automatically "property damage" in the Seventh Circuit's opinion in *Cont'l Cas. Co.*, 652 F.3d 804. In *Cont'l Cas. Co.*, the Seventh Circuit stated,

> No insurer would write such a policy; the moral hazard would be overpowering. Protected by a policy covering the costs of improvements, a builder would produce a substandard project and demand that the insurer finish the job; builder and buyers could split the savings. Insurers, recognizing this incentive, would raise the price of their policies so high that no builder planning to do the job right would find the offer attractive. The result would be the collapse of the insurance market. No one would gain, and honest builders would lose because insurance would no longer be available. That's why [plaintiff's] policy does not cover the expense of improving the subdivision's flood defenses.

*Id*. at 805. Applying the Seventh Circuit's reasoning to the case before the Court, the Court once again concludes that the Primary Policy did not undertake to insure the cost of repairing Ellison's allegedly faulty work. Accordingly, DFG has failed to establish that the court committed a manifest

error of law or fact, or that newly discovered evidence precluded entry of judgment. Accordingly, DFG's Motion is **denied**. *Beyrer*, 722 F.3d at 954.

### IV. CONCLUSION

For the reasons discussed above, DFG's Motion to Amend or Alter Judgment pursuant to Federal Rule of Civil Procedure 54(b), (Filing No. 92) is **DENIED**.

**SO ORDERED**.

Date: 12/3/2025

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

Distribution:

Edmund Leonard Abel
LEWIS WAGNER, LLP
eabel@lewiswagner.com

Tyler Lewis Jones
Drewry Simmons Vornehm, LLP
tjones@dsvlaw.com

Kyle Andrew Lansberry
LEWIS WAGNER, LLP
klansberry@lewiswagner.com

James P. Strenski
Drewry Simmons Vornehm, LLP
jstrenski@dsvlaw.com

John A. Stroh
SHARPNACK BIGLEY STROH & WASHBURN LLP
sbsw@sbswlaw.com